1  Paul J. Fishman
Arnold & Porter Kaye Scholer LLP
2  One Gateway Center
Suite 1025
3  Newark, NJ 07102-5310
Tel: (212) 836-8152
4  Fax: (212) 836-8689
Paul.Fishman@arnoldporter.com

5
*Counsel for Defendant Scott Carpenter*

6

7               UNITED STATES DISTRICT COURT
                   DISTRICT OF NEVADA
8

9  **United States of America,**

10            **Plaintiff,**

11            **v.**

12  **Scott F. Carpenter,**

13            **Defendant.**

14

15

2:22-cr-22-GNM-NJK

**DEFENDANT'S SENTENCING
MEMORANDUM**

16        As the Court is aware, the plea agreement in this matter provides that the United States

17  and the defense will recommend that the Court impose a non-custodial sentence. On behalf of our

18  client, Scott Carpenter, we respectfully submit this Memorandum pursuant to Local Rule 32-1(d)

19  to highlight certain matters that explain why such a sentence is just, fair, and appropriate.  In

20  particular, we respectfully suggest that the circumstances of the offense, Mr. Carpenter's

21  character and service to this country, and the extraordinarily responsible way in which he has

22  handled this entire tragic episode all warrant the Court's lenience.

23  **I. Mr. Carpenter's Education and Public Service**

24        A native of New Jersey, Mr. Carpenter attended Wake Forest University.  Although his

upbringing and education offered a myriad of opportunities in the business world, Mr. Carpenter elected instead to become a member of ROTC. After his graduation in 2003 as a commissioned second lieutenant and at the top of his ROTC class, he volunteered for and completed Ranger school, and then became a member of the 82nd Airborne Division stationed at Fort Bragg. He was both an excellent soldier and officer. Indeed, his superior officers regarded him so highly that he quickly assumed the role of platoon leader. Several evaluations noted his "unlimited potential," and one superior wrote that Mr. Carpenter was a "superb leader" with whom he would "fight" to serve again. *See* Exhibit A.

During his service, Mr. Carpenter deployed twice to Iraq. During his first stint, which began in late 2005 and lasted five months, he was stationed in Kurdistan on the border with Iran. Shortly before Christmas 2006, after his promotion to Captain, Mr. Carpenter received unexpected orders to return to Iraq. This tour, which began in January 2007, was much more grueling. He was stationed at Forward Operating Base Loyalty in Baghdad -- a particularly dangerous posting with daily mortar and rocket fire.[1] And while the deployment was supposed to be short-term, it lasted for 15 months.

One episode, in particular, profoundly affected Mr. Carpenter: in the summer of 2007, an IED destroyed a Humvee right behind the one in which he was traveling. Although he was not hurt physically, the explosion -- coupled with the lengthy deployment -- took their toll emotionally. As a result, he began to drink more heavily, and he decided to return to civilian life. On Memorial Day, 2008, Mr. Carpenter signed out of Fort Bragg with an honorable discharge and the Bronze Star.

In the fall of 2008, Mr. Carpenter applied to the FBI. While his application was pending, he served as an ROTC instructor at Princeton. The FBI finally called in mid-2009, and he enrolled in the Academy in September. When he graduated, he was assigned to the New York office.

---

[1] *See* https://www.stripes.com/news/getting-used-to-the-racket-rockets-1.68538;
https://www.stripes.com/news/mortars-are-a-constant-presence-at-fob-loyalty-1.58407.

Mr. Carpenter quickly became a highly regarded special agent who was involved in and assumed responsibility for significant investigations.  For example, in 2014, a colleague asked if he could assist in the sprawling investigation of FIFA, the international soccer organization. Soon after his transfer to the squad handling that matter, he assumed the responsibilities of co-case agent.  In that capacity, he played a primary role developing the evidence that led to the major superseding indictment charging bribery and corruption among Central and South American soccer officials.

While he enjoyed substantial success at the FBI, he simultaneously struggled with the lasting effects of his experiences in Iraq, as well as his loss of a close friend who died in Afghanistan shortly after Mr. Carpenter joined the FBI.

## II. Mr. Carpenter's Role in the NCAA Investigation

In late 2016, a supervisor who had worked with Mr. Carpenter on another squad recruited him to take over as the case agent on the FBI's high-profile investigation of bribery in college basketball.  The investigation was wide-ranging and involved a number of FBI agents, as well as investigators from the U.S. Attorney's Office for the Southern District of New York.  Over the course of approximately the next nine months, Mr. Carpenter coordinated 19 wiretap applications or renewals; hundreds of consensually monitored communications among a confidential source, two FBI undercover agents, and a myriad of subjects; the service of dozens of grand jury subpoenas; the review of documents; and substantial physical surveillance across the country.  Mr. Carpenter also was responsible for coordination and liaison with other components of the FBI's New York Office, many field offices, a variety of officials at FBI headquarters, and personnel at other law enforcement agencies.

In addition, there was considerable tension between the FBI and the SDNY over the pace of the investigation, frequent discussions (including some disagreements) over strategy and direction, and extensive travel.  A brief excerpt from Mr. Carpenter's annual evaluation summarizes both the scope of his responsibilities on this investigation and the skill and talent

with which he handled them:

> SA Carpenter showed a mastery of complex investigative and legal challenges and during the course of dozens of CHS/UC meetings he consistently exhibit[ed] highly effective decision making in challenging, ambiguous and rapidly changing situations. SA Carpenter continually tailored an evolving investigative plan in a proactive manner and consistently identified alternatives to address highly complex problems while dealing with a very difficult target set. In particular, SA Carpenter displayed superior ability to simultaneously execute Title III operations and CHS/UCE operations in a coordinated manner. This resulted in superior results, including frequent incriminating admissions by subjects of not only their historical criminal conduct but future plans and specific intent. At a critical phase of the case, a UC was asked to provide a loan to a third party. SA Carpenter recognized this as an opportunity to expand the case and as critical to preserving the UC's bona fides as a high roller. SA Carpenter effectively and passionately advocated for approval to move forward with this loan, despite initial resistance from SDNY who eventually concurred with the loan. SA Carpenter used this opportunity to secure additional evidence against a subject. This directly resulted in a Title III on the subject's mobile phone and set in motion events which would widely expand the case from addressing bribery by NCAA coaches to incorporating the illegal conduct of officials at a major international Sportswear company.

*See* Exhibit B.

The breadth of the investigation and the relentless workload compounded the pressure under which Mr. Carpenter was working. In an effort to reduce that pressure, Mr. Carpenter frequently raised the staffing and resource concerns with his squad leader, who was aware of some of Mr. Carpenter's personal issues and shared Mr. Carpenter's view that the investigation required additional personnel. Unfortunately, their requests for additional support were never fully addressed, and the stress of the investigation caused Mr. Carpenter to drink more. Indeed, by then, Mr. Carpenter was often drinking to intoxication to cope with his symptoms of PTSD as well as the demands of his job.

In the middle of that maelstrom, there was a proposal to pursue an undercover operation in Las Vegas. Although Mr. Carpenter had serious misgivings about adequately staffing that mission, his concerns were overruled. So, on July 27, 2017, Mr. Carpenter -- together with his supervisor, his relatively new and inexperienced co-case agent, and the undercover agent --

4

traveled to Las Vegas for a series of meetings with a confidential informant and certain subjects. They brought with them approximately $135,000 in cash – much of which was "marked" bribe money, and some of which was for the undercover agent's use in his role as a big spender.

Unanticipated operational and logistical issues threatened to derail the operation and intensified the pressure on Mr. Carpenter and his colleagues. Despite the obstacles, all of the undercover meetings were very successful. At the same time, there is no doubt that the intensity, anxiety, elation, and exhaustion of the weekend's activities left Mr. Carpenter in an even more precarious position.

Unfortunate personal circumstances also contributed to Mr. Carpenter's vulnerability. As Mr. Carpenter's father describes in his letter to the Court, a very close family friend passed away shortly before the Las Vegas trip. *See* Exhibit C. Mr. Carpenter, who was asked to be a pallbearer, could not fulfill that responsibility because of the trip. His inability to attend the funeral made the loss that much more painful.

### III. The Offense

On Saturday, July 29, the last day of their undercover operation in Las Vegas, the agents obtained supervisory approval to rent a poolside cabana at the Cosmopolitan to enhance the undercover agent's bona fides. After the final meeting ended around midday, the agents learned that the cabana's rental fee of $1,500 was actually a minimum charge for food and beverages. As a result, all four agents spent the rest of the afternoon eating and drinking in the cabana and around the pool. Over the course of the afternoon, Mr. Carpenter himself drank at least a six-pack of beer, followed by nearly an entire bottle of vodka.

The agents then returned to the undercover suite at the Cosmopolitan, where they showered, changed clothes, and prepared to go out for the evening. While doing so, and still inebriated, Mr. Carpenter -- in the presence of at least one of his colleagues -- obtained approximately $10,000 in undercover funds from the suite's safe. The four agents then went next door to a "high roller" room at the Bellagio. Mr. Carpenter sat down to play blackjack; his

colleagues sat at an adjacent bar with a view of the table, taking turns visiting with him and watching as he gambled. Over the course of the evening, Mr. Carpenter continued to drink the free cocktails provided by the casino.

Although he had intended to replace the money if he had won, the result was predictable: he lost the $10,000. He then pressed the undercover agent for more funds; when his colleague acquiesced, Mr. Carpenter lost that money as well. Casino records apparently confirm that his total gambling losses that evening were $13,500.

Although all three of his colleagues had watched him drink and gamble, Mr. Carpenter understood that the entire episode was his fault and that the ultimate responsibility was his. Accordingly, by the time he arrived home two days later, on July 31, Mr. Carpenter's resolve was complete: he would have a full and frank discussion of his conduct with his supervisors and his family, and he would pay the money back as quickly as possible.

### IV. Mr. Carpenter's Exemplary Behavior After the Offense

On Wednesday, August 2, after a scheduled day off, Mr. Carpenter returned to his squad and went directly to his supervisor's office to discuss his actions. Completely remorseful, and fully admitting his conduct, he had additional conversations over the next two days with both his squad leader and with the Assistant Special Agent in Charge ("ASAC").[2] With each, Mr. Carpenter acknowledged his mistake, promised to repay the funds, and assured that he would fully address his issues.

Mr. Carpenter was true to his word. A week later, on August 10, he admitted himself to the in-patient program for alcoholism at Geisinger Marworth Treatment Center in Waverly, Pennsylvania. In addition, while he was in that residential facility, he arranged for his father to

---

[2] Paragraphs 14-21 Revised Presentence Investigation Report ("PSR") of the include certain information that the three other FBI agents who traveled to Las Vegas provided during their interviews by the Office of the Inspector General ("OIG"). To the extent that those renditions suggest or imply that Mr. Carpenter intended in any way to conceal his conduct or evade responsibility, he vehemently disagrees. However, we concur with the Government that the Court need not resolve any such discrepancies before imposing sentence. Accordingly, Mr. Carpenter respectfully asks Your Honor to disregard them.

make full restitution on his behalf.[3]

After completing inpatient treatment, Mr. Carpenter enrolled at an intensive outpatient facility for an additional three months, and he continued to see a therapist of his own accord until April 2021. As the letter from his therapist describes, Mr. Carpenter was fully compliant in his recovery, and he has now fully addressed his issues with alcohol. *See* Exhibit D.

In the late fall of 2017, following his medical leave, Mr. Carpenter resumed work at the FBI's New York Field Office. Although he remained a Special Agent -- with a full security clearance, badge, and service weapon -- Mr. Carpenter was reassigned to a "facilities squad" where his principal role was to monitor work by outside contractors working in FBI office space. He remained in that position for three years, and received very positive evaluations.

Mr. Carpenter received particular praise for "provid[ing] significant medical assistance to a construction worker that came into contact with a live electrical wire and was seriously injured … Special Agent Carpenter's swift actions during this medical emergency were critical in ensuring that the injuries suffered by the construction worker were quickly addressed and prevented from becoming worse or life threatening." *See* Exhibit B. This was not an isolated example of Mr. Carpenter's selfless service. In the summer of 2020, Mr. Carpenter was treated for smoke inhalation after he entered an asbestos containment area to put out a serious fire.

In October 2020, after three years, the FBI finally transferred him to a counterintelligence squad, where he regained the customary responsibilities of an FBI agent. Although his precise duties and responsibilities are classified, it was apparent that the FBI's operational personnel believed him to be of sufficient character and trustworthiness to justify his holding such a position.

---

[3] On August 15, Mr. Carpenter's father, Frank Carpenter, mailed a check for $15,000 to an attorney frequently consulted by members of the Federal Law Enforcement Officers Association. Mr. Carpenter had engaged that attorney upon the recommendation of the ASAC. When they contacted the attorney, both Mr. Carpenter and his father made clear that the attorney was to transmit the money to the FBI on Mr. Carpenter's behalf. Unfortunately, and for reasons that we have been unable to establish, the attorney never made arrangements to do so. A year later, at the request of Frank Carpenter, the attorney returned the check. However, as we have made repeatedly made clear to the Government, Mr. Carpenter has been prepared to make full restitution at any time.

He remained on that squad through the spring of this year.  However, as a result of his guilty plea, Mr. Carpenter was suspended without pay and subsequently summarily dismissed from the rolls of the FBI.[4]

## V. A Non-Custodial Sentence is Appropriate

A non-custodial sentence for Mr. Carpenter is warranted, not only because the Government will recommend one, but because the facts and circumstances warrant and justify that result.

First, Mr. Carpenter has fully taken responsibility for his actions from the moment he returned to his duty station in New York.  More important, he has taken every step he could to make things right.  He self-reported to his supervisors; he checked himself into a rehabilitation facility to address the underlying issues that led to the conduct; he attempted to make restitution to the FBI (an effort that failed through no fault of his own); he accepted his position on the facilities squad without complaint and worked his way back to a counterintelligence squad; and, finally, he pled guilty to his conduct, and unequivocally and publicly acknowledged what he did wrong.

## VI. There is No Need for Deterrence

As a United States citizen, decorated veteran, and law enforcement agent, Mr. Carpenter has great respect for his country and its laws.  His conduct in Las Vegas arose not out of any intention to steal from the United States or keep government money, but from an ill-advised, one-time, drunken lack of judgment.  In short, Mr. Carpenter's conduct in Las Vegas was a singular aberration from his stellar record in both the Army and the FBI, as well as a marked deviation from his character.

On the other hand, Mr. Carpenter's response to his actions in Las Vegas were entirely typical of the dedicated and honest man that his friends and family have always known.  Retired

---

[4] Even then, he cooperated with the OIG's investigation of the other agents. At the request of USAO and OIG, Mr. Carpenter voluntarily agreed to an interview, which took place on April 1, 2022.

Colonel Michael Pratt, with whom Mr. Carpenter served in Iraq, has extolled Mr. Carpenter's high moral principles, his active approach to self-improvement, and his unmatched "ability to turn chaos into order." *See* Exhibit E. Similarly, John Penza, who was Mr. Carpenter's supervisor on the FIFA investigation, describes Mr. Carpenter as "articulate, honest, intelligent, patriotic, passionate and able to adapt to stressful situations." *See* Exhibit F. Mr. Carpenter's wife of seven years, Beth Carpenter, also knows him as "stand-up citizen" who is "a great husband, son, uncle, cousin, and friend." *See* Exhibit G.

All of those traits were evident throughout Mr. Carpenter's service in the Army and the FBI, and they were evident when he promptly self-reported his mistake and dedicated himself to confronting and improving his mental health.  In other words, one uncharacteristic mistake has changed neither the faith nor the high regard of his family, friends, and colleagues.

All of that confidence of those who know him best reinforces that Mr. Carpenter has fully addressed the underlying issues that led to the offense and that there is no risk of recurrence.  To the contrary, his commitment to his well-being is evident. He completed both inpatient and outpatient programs for alcohol abuse, and continued to see a therapist through April of 2021. He has fully addressed his issues with alcohol since the night of the offense in Las Vegas, and was able to preserve his marriage to his wife, Beth, by dedicating himself to improving his mental health and overcoming his drinking problem.

### VII. The Effect on Mr. Carpenter and his Family

While Mr. Carpenter has accepted the consequences of his conduct in Las Vegas without complaint, the overall damage to him and his family is clear and concrete. Most visibly, he has now been summarily dismissed as a Special Agent, a job he loved and at which he excelled.  The sting is sharper for having come almost five years after the conduct itself, during which Mr. Carpenter continued to serve with distinction with his superiors' full knowledge of his mistake in Las Vegas.

More profound are the effects on his family.  During the five years that this matter has been pending, he and his wife have suffered immense stress, and Beth's health has deteriorated

and required multiple hospitalizations (including as recently as August 9). He and Beth have wanted to start a family for years, but have delayed their plans because of the consistent uncertainty whether there would a prosecution or employment action. Now, both time and Beth's health threaten the possibility of their ever having children. All of that is sanction enough, and there is no need for any additional deterrence.

## VIII. Conclusion

On July 29, 2017, FBI Special Agent Scott Carpenter made a tragic mistake that will haunt him for the rest of his life. And for that conduct, he has paid a substantial price. He has lost the job he loved, and he has pled guilty to a federal crime.

Equally important, Scott Carpenter knew he had made a grave mistake when he woke up on July 30, 2017. He has spent the past five years doing what he could to right his wrong. He promptly self-reported, addressed his underlying mental health issues, improved his personal life and relationships, and remained an asset to the FBI until the dismissal prompted by his guilty plea. He has fully accepted responsibility for his actions and is genuinely remorseful.

We respectfully ask the Court to sentence Scott Carpenter to a non-custodial sentence.

DATED this 10th day of August 2022.

*/s/ Paul J. Fishman*

PAUL J. FISHMAN
Arnold & Porter Kaye Scholer LLP
One Gateway Center
Suite 1025
Newark, NJ 07102-5310
Paul.Fishman@arnoldporter.com
*Counsel for Defendant*

1

## Index of Exhibits

2

3

**Exhibit A:**   Excerpt from Mr. Carpenter's Army Officer Record Brief

**Exhibit B:**   Excerpt from Mr. Carpenter's FBI Appraisals

4

5

**Exhibit C:**   Letter from Frank Carpenter, dated August 10, 2022

**Exhibit D:**   Letter from Michael Cocuzza,, MS, LPC, LCADC, dated August
6                        10, 2022

7

**Exhibit E:**   Letter from Retired Colonel Michel Pratt, dated August 7, 2022
                        (filed with personal address redacted)

8

9

**Exhibit F:**   Letter from John Penza, dated August 8, 2022 (filed with
                        personal address redacted)

10

**Exhibit G:**   Letter from Beth Carpenter, dated August 8, 2022 (filed under
                        seal)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT A

01957221

| | |
|---|---|
| **OFFICER EVALUATION REPORT** | **FOR OFFICIAL USE ONLY (FOUO)** |
| For use of this form, see AR 623-3; the proponent agency is DCS, G-1. | SEE PRIVACY ACT STATEMENT IN AR 623-3 |

### PART I - ADMINISTRATIVE DATA

| a. NAME (Last, First, Middle Initial) | | b. SSN | | c. RANK | d. DATE OF RANK (YYYYMMDD) | e. BRANCH | f. DESIGNATED / SPECIALTIES / PMOS (W0) |
|---|---|---|---|---|---|---|---|
| CARPENTER, SCOTT F. | | | | CPT | 20060616 | IN | 11A |

| g. 1. UNIT, ORG., STATION, ZIP CODE OR APO, MAJOR COMMAND | g 2. STATUS CODE | h. REASON FOR SUBMISSION |
|---|---|---|
| HHC 1-504TH PIR, 82D ABN DIV, FT BRAGG, NC 28310   (FORSCOM) | 02 | ANNUAL |

| i. PERIOD COVERED | | j. RATED MONTHS | k. NONRATED CODES | l. NO. OF ENCL | m. RATED OFFICER'S AKO EMAIL ADDRESS (.gov or mil) | n. UIC | o. CMD CODE | p. PSB CODE |
|---|---|---|---|---|---|---|---|---|
| FROM (YYYYMMDD) | THRU (YYYYMMDD) | | | | | | | |
| 20070302 | 20080301 | 12 | | | | WABST0 | FC | UA09 |

**PART II - AUTHENTICATION** *(Rated officer's signature verifies officer has seen completed OER Parts I-VII and the admin data is correct)*

| a. NAME OF RATER (Last, First, MI) | SSN | RANK | POSITION | SIGNATURE | DATE (YYYYMMDD) |
|---|---|---|---|---|---|
| PRATT, MICHAEL G. | | MAJ | Battalion S3 | PRATT.MICHAEL.GLENN.1051974 | 20080216 |

| b. NAME OF INTERMEDIATE RATER (Last, First, MI) | SSN | RANK | POSITION | SIGNATURE | DATE (YYYYMMDD) |
|---|---|---|---|---|---|
| | | | | | |

| c. NAME OF SENIOR RATER (Last, First, MI) | SSN | RANK | POSITION | SIGNATURE | DATE (YYYYMMDD) |
|---|---|---|---|---|---|
| ALEX, CARL A. | | LTC | Battalion Commander | ALEX.CARL.ADRIAN.1047116 | 20080216 |

| SENIOR RATER'S ORGANIZATION | BRANCH | SENIOR RATER TELEPHONE NUMBER | E-MAIL ADDRESS (.gov or .mil) | |
|---|---|---|---|---|
| HHC, 1-504TH PIR, 82D ABN DIV FORT BRAGG, NC 28310 | IN | d. This is a referred report, do you wish to make comments? ☐ Yes, comments are attached ☒ No | e. SIGNATURE OF RATED OFFICER CARPENTER.SCOTT.F.1246944 | DATE (YYYYMMDD) 20080219 |

### PART III - DUTY DESCRIPTION

| a. PRINCIPAL DUTY TITLE   BATTALION ASSISTANT OPERATIONS OFFICER | b. POSITION AOC/BR   11A5S |
|---|---|

c. SIGNIFICANT DUTIES AND RESPONSIBILITIES. REFER TO PART IVa, DA FORM 67-9-1.

Assistant Operations Officer of an 825 man Airborne Infantry Battalion Task Force in the 82nd Airborne Division ready to deploy worldwide within 18 hours of notification to conduct an airborne assault, airfield seizure, and follow on combat operations that lead to successful achievement of tactical, operational, and strategic objectives. Responsible for tactical planning, current air and ground operations, airborne operations training resources, and readiness. Serves as the battle captain in charge of the task force's Tactical Operations Center; manages all of the battalion's off post training deployments and training activities.

### PART IV - PERFORMANCE EVALUATION - PROFESSIONALISM *(Rater)*

**CHARACTER** Disposition of the leader: combination of values, attributes, and skills affecting leader actions

**a. ARMY VALUES** *(Comments mandatory for all "NO" entries. Use PART Vb.)*

| | Yes | No | | Yes | No |
|---|---|---|---|---|---|
| 1. HONOR: Adherence to the Army's publicly declared code of values | ☒ | | 5. RESPECT: Promotes dignity, consideration, fairness, & EO | | ☒ |
| 2. INTEGRITY: Possesses high personal moral standards; honest in word and deed | ☒ | | 6. SELFLESS-SERVICE: Places Army priorities before self | | ☒ |
| 3. COURAGE: Manifests physical and moral bravery | ☒ | | 7. DUTY: Fulfills professional, legal, and moral obligations | | ☒ |
| 4. LOYALTY: Bears true faith and allegiance to the U.S. Constitution, the Army, the unit, and the soldier | | | | | ☒ |

**b. LEADER ATTRIBUTES / SKILLS / ACTIONS:** First, mark "YES" or "NO" for each block. Second, choose a total of six that best describe the rated officer. Select one from ATTRIBUTES, two from SKILLS (Competence), and three from ACTIONS (LEADERSHIP). Place an "X" in the appropriate numbered box with optional comments in PART Vb. Comments are mandatory in Part Vb for all "No" entries.

| b.1  ATTRIBUTES (Select 1) | ☒ 1. MENTAL YES ☐ NO | 2. PHYSICAL YES ☐ NO | 3. EMOTIONAL YES ☐ NO |
|---|---|---|---|
| Fundamental qualities and characteristics | Possesses desire, will, initiative, and discipline | Maintains appropriate level of physical fitness and military bearing | Displays self-control; calm under pressure |

| b.2  SKILLS (Competence) (Select 2) | ☒ 1. CONCEPTUAL YES ☐ NO | 2. INTERPERSONAL YES ☐ NO | 3. TECHNICAL YES ☐ NO |
|---|---|---|---|
| Skill development is part of self-development; prerequisite to action | Demonstrates sound judgment, critical/creative thinking, moral reasoning | Shows skill with people: coaching, teaching, counseling, motivating and empowering | Possesses the necessary expertise to accomplish all tasks and functions |

| | ☒ 4. TACTICAL   Demonstrates proficiency in required professional knowledge, judgment, and warfighting | | YES ☐ NO |
|---|---|---|---|

**b.3. ACTIONS (LEADERSHIP)** *(Select 3)* Major activities leaders perform: influencing, operating, and improving

| INFLUENCING | ☒ 1. COMMUNICATING YES ☐ NO | ☒ 2. DECISION-MAKING YES ☐ NO | 3. MOTIVATING YES ☐ NO |
|---|---|---|---|
| Method of reaching goals while operating / improving | Displays good oral, written, and listening skills for individuals / groups | Employs sound judgment, logical reasoning and uses resources wisely | Inspires, motivates, and guides others toward mission accomplishment |

| OPERATING | ☒ 4. PLANNING YES ☐ NO | 5. EXECUTING YES ☐ NO | 6. ASSESSING YES ☐ NO |
|---|---|---|---|
| Short-term mission accomplishment | Develops detailed, executable plans that are feasible, acceptable, and suitable | Shows tactical proficiency, meets mission standards, and takes care of people/resources | Uses after-action and evaluation tools to facilitate consistent improvement |

| IMPROVING | 7. DEVELOPING YES ☐ NO | 8. BUILDING YES ☐ NO | 9. LEARNING YES ☐ NO |
|---|---|---|---|
| Long-term improvement in the Army its people and organizations | Invests adequate time and effort to develop individual subordinates as leaders | Spends time and resources improving teams, groups and units; fosters ethical climate | Seeks self-improvement and organizational growth; envisioning, adapting and leading change |

| c. APFT: PASS | DATE: 20070815 | HEIGHT 68 | WEIGHT: 180 | YES |
|---|---|---|---|---|

| d. OFFICER DEVELOPMENT - MANDATORY YES OR NO ENTRY FOR RATERS OF CPTs, LTs, CW2s, AND WO1s. WERE DEVELOPMENTAL TASKS RECORDED ON DA FORM 67-9-1a AND QUARTERLY FOLLOW-UP COUNSELINGS CONDUCTED? | YES ☐ NO ☐ NA |
|---|---|

| DA FORM 67-9, MAR 2006 | PREVIOUS EDITIONS ARE OBSOLETE. | Page 1 of 2 |
|---|---|---|
| | | APD PE v3.01ES |

| NAME CARPENTER, SCOTT F. | SSN | PERIOD COVERED 20070302 | – 20080301 | — |
|---|---|---|---|---|

┼

**PART V – PERFORMANCE AND POTENTIAL EVALUATION** *(Rater)*

a. EVALUATE THE RATED OFFICER'S PERFORMANCE DURING THE RATING PERIOD AND HIS/HER POTENTIAL FOR PROMOTION

☒ OUTSTANDING PERFORMANCE, MUST PROMOTE ☐ SATISFACTORY PERFORMANCE, PROMOTE ☐ UNSATISFACTORY PERFORMANCE, DO NOT PROMOTE ☐ OTHER (Explain)

b. COMMENT ON SPECIFIC ASPECTS OF THE PERFORMANCE, REFER TO PART III, DA FORM 67-9 AND PART IVa, b, AND PART Vb, DA FORM 67-9-1.

CPT Scott Carpenter's performance of duty as the Battalion Battle Captain and Battalion Assistant Operations Officer during the wartime deployment to Baghdad, Iraq, has been absolutely phenomenal. Although Scott is a junior CPT in the Battalion, he was selected by the Battalion Commander to fulfill very important duties at critical phases of the deployment due to his superior maturity, initiative, and competence. As the Battle Captain, CPT Carpenter established the SOPs and Battle Drills crucial to the success of the command and control of the Battalion as the main effort for Baghdad combat operations. Scott's ability to turn chaos into order is unmatched by his peers, and he has a calming affect on all of those surrounding him while successfully managing several challenging tasks simultaneously. Due to his technical and tactical expertise in information management and in creating effective systems, he was selected to author and implement the command post SOP during the establishment of two Joint Security Stations manned by the Iraqi Army, Iraqi Police, and Coalition Forces. CPT Carpenter was then selected to perform the duties as the Assistant Operations Officer where he planned and resourced over 30 Battalion-sized combat operations. CPT Scott Carpenter is superb leader, and I would fight to serve with him again in the future.

c. COMMENT ON POTENTIAL FOR PROMOTION.

CPT Carpenter has unlimited potential and deserves more responsibility. Select for Maneuver Captain's Career Course (MCCC) and assign as a Rifle Company Commander ahead of peers. Manage his career wisely.

d. IDENTIFY ANY UNIQUE PROFESSIONAL SKILLS OR AREAS OF EXPERTISE OF VALUE TO THE ARMY THAT THIS OFFICER POSSESSES. FOR ARMY COMPETITIVE CATEGORY CPT ALSO INDICATE A POTENTIAL CAREER FIELD FOR FUTURE SERVICE.

Would best serve in functional category MFE/11.

**PART VI – INTERMEDIATE RATER**

**PART VII –SENIOR RATER**

a. EVALUATE THE RATED OFFICER'S PROMOTION POTENTIAL TO THE NEXT HIGHER GRADE

I currently senior rate 23 officer(s) in this grade

A completed DA Form 67-9-1 was received with this report and considered in my evaluation and review ☒ YES ☐ NO (Explain in c)

☒ BEST QUALIFIED ☐ FULLY QUALIFIED ☐ DO NOT PROMOTE ☐ OTHER (Explain below)

b. POTENTIAL COMPARED WITH OFFICERS SENIOR RATED IN SAME GRADE [OVERPRINTED BY DA) HQDA COMPARISON OF THE SENIOR RATER'S PROFILE AND BOX CHECK AT THE TIME THIS REPORT WAS PROCESSED

NO BOX CHECK

RO: CPT CARPENTER SCOTT F

SR: LTC ALEX CARL A

DATE: 2008 03 02

TOTAL RATINGS:

RATINGS THIS OFFICER:

c. COMMENT ON PERFORMANCE/POTENTIAL

CPT Carpenter is the best Staff Captain in this Battalion Task Force. A very mature and competent officer, CPT Carpenter has performed exceptionally in a critical staff position during combat operations. CPT Carpenter's leadership, dedication to duty, and mission accomplishment is without comparison. CPT Carpenter must attend MCCC and command a company at the soonest opportunity. Unlimited potential

d. LIST THREE FUTURE ASSIGNMENTS FOR WHICH THIS OFFICER IS BEST SUITED. FOR ARMY COMPETITIVE CATEGORY CPT, ALSO INDICATE A POTENTIAL CAREER FIELD FOR FUTURE SERVICE.

Rifle Company Commander, Battalion Assistant S3, BCT Plans Officer
Would best serve in functional category MFE/11.

# EXHIBIT B

**FD-728a**
Revised
12-23-2014

FEDERAL BUREAU OF INVESTIGATION
Performance Appraisal System — Special Agent and Professional Staff
**Performance Appraisal Report - Cover Page**

## EMPLOYEE AND RATING INFORMATION

| | |
|---|---|
| 1. Payroll Name of Employee:<br>Scott F Carpenter | 2. Employee's Personnel File Number: |
| 3. Position Title, Grade and Position Number:<br>Special Agent | 4. Office of Assignment and Cost Code:<br>New York / |

| | |
|---|---|
| 5. Type of Appraisal:<br><br>   (A)    Rating of Record    Date: 9/30/2017 | 6. Summary Rating:<br><br>  [ ] Unacceptable<br>  [ ] Minimally Successful<br>  [✓] Successful<br>  [ ] Excellent<br>  [ ] Outstanding |

## SIGNATURES

7. _Signature of Rating Official_      SSA Brian Wittenberg      Date
                                      Name (Typed or Printed)

8. _Signature of Reviewing Official_      ASAC George Khouzami      10/23/17
                                        Name (Typed or Printed)      Date

**I am aware that a rating of Unacceptable will preclude me from consideration for promotion, transfer, and/or a within-grade increase and may be the basis for my reassignment, reduction in grade, or removal. My signature only indicates that I have reviewed this appraisal, not that I am necessarily in agreement with the information herein or that I am relinquishing my right to request reconsideration of it.**

9. _Signature of Employee_      10/27/17
                      Date

## BPMS / PAU

| 10. Field/FBIHQ Division Use — Entered into BPMS | PAU USE ONLY: |
|---|---|
| By: _____<br>    (Initials)<br>On: _____<br>    (Date)<br>Date of Plan: _____<br>Plan Renewal Date: _____ | **Logged:** _____<br>**Reviewed:** _____<br>**Entered:** _____<br>**Verified:** _____ |

| FD-728b<br>Revised<br>12-23-2014 | FEDERAL BUREAU OF INVESTIGATION<br>Performance Appraisal System -- Special Agent and Professional Staff<br>**Performance Appraisal Report - Evaluation Page** |
|---|---|

| EMPLOYEE INFORMATION | |
|---|---|
| 1. Payroll Name of Employee:<br>Scott F Carpenter | 2. Employee's Personnel File Number: |

**EVALUATION**

| Critical Element | | Rating Level | | | | | |
|---|---|---|---|---|---|---|---|
| | | Unacceptable | Minimally Successful (2) | Successful (3) | Excellent (4) | Outstanding (5) | Numeric Value |
| 1. | Investigating, Decision Making, and Analyzing | ☐ | ☐ | ☐ | ☐ | ☑ | 5 |
| 2. | Organizing, Planning, and Coordinating | ☐ | ☐ | ☐ | ☑ | ☐ | 4 |
| 3. | Relating with Others and Providing Professional Service | ☐ | ☑ | ☐ | ☐ | ☐ | 2 |
| 4. | Acquiring, Applying, and Sharing Job Knowledge | ☐ | ☐ | ☑ | ☐ | ☐ | 3 |
| 5. | Maintaining High Professional Standards | ☐ | ☑ | ☐ | ☐ | ☐ | 2 |
| 6. | Communicating Orally and in Writing | ☐ | ☐ | ☐ | ☑ | ☐ | 4 |
| 7. | Achieving Results | ☐ | ☐ | ☐ | ☐ | ☑ | 5 |
| 8. | Intelligence | ☐ | ☐ | ☑ | ☐ | ☐ | 3 |

**Sum of Numeric Values:**        28   [3]

÷

**Number of Critical Elements:**        8   [4]

=        3.50   [5]

| | |
|---|---|
| **FD-728c**<br>Revised<br>12-23-2014 | FEDERAL BUREAU OF INVESTIGATION<br>Performance Appraisal System — Special Agent and Professional Staff<br>**Performance Appraisal Report - Overall Summary Rating Narrative Page** |

**EMPLOYEE INFORMATION**

| | |
|---|---|
| 1. Payroll Name of Employee:<br>Scott F Carpenter | 2. Employee's Personnel File Number: |

**OVERALL SUMMARY RATING NARRATIVE**

SA Carpenter's overall rating is Successful.

In fall 2017, SDNY contacted FBI NY regarding a stalled sports bribery investigation with major unrealized potential which they had been unilaterally investigated. After an initial assessment of the case, SA Carpenter was identified as a SA with Lead Case Agent skills capable of advancing such an investigation and subsequently transferred to C14 from C24 in November of 2017.

Upon arrival to C14 SA Carpenter immediately immersed himself in the historical investigation conducted by SDNY as well as integrating himself into a new squad. SA Carpenter quickly developed rapport with is peers on C14 and began to build a core investigative team which would prove highly effective. From the beginning of his assignment to C14 until his transfer from C14 on 8/4/2017, SA Carpenter was a highly effective Lead Case Agent who served in a critical role for Ballerz, which ultimately became a major Group I UC/CHS operation. During this rating period Ballerz was C14's top priority and a major priority for the Criminal Division. SA Carpenter was critical in building and leading a cohesive investigative core investigative team of multiple Special Agents and multiple embedded Intel and FOA personnel. Ballerz operations ultimately included 19 Title III initiations or renewals, hundreds of consensually monitored communications conducted by a CHS and two FBI UCEs as well the employment of grand jury subpoenas, surveillance and other traditional investigative techniques. Investigative coordination was required with multiple components within the NYO, FBI Field Offices, FBIHQ and externally. The rest of C14 also played a major role in this investigation along with major engagement by Squad C-4, other Squads on Branch D, SDNY Investigators and Agents from A-4 and A-7. Due to the complexity, potential and requirements of this case, SA Carpenter was not assigned any other investigative matters and he performed admirably.

SA Carpenter displayed superior ability in investigating, decision making and analyzing. At the start of the case SA Carpenter immediately engaged with SDNY AUSAs and a SDNY investigator who had run the investigation to date and was able to quickly and effectively evaluate a lengthy complex investigation along with significant historical CHS info. SA Carpenter was able to quickly understand and master the complexities of the underlying legal theory relating to the investigation as well as the specific official action thresholds required. SA Carpenter quickly developed an expertise on the legal foundation for the case, including the practical application of how the SCOTUS McDonnell ruling. SA Carpenter incorporated this new paradigm into his investigative decision making with excellent results. SA Carpenter was able to effectively communicate the relevance of the legal challenges to a relativity inexperienced team of Co-Case Agents who he has mentored throughout this investigation as well as ensuring they CHS and UCES were prepared to succeed in their roles.

SA Carpenter showed a mastery of complex investigative and legal challenges and during the course of dozens of CHS/UC meetings he consistently exhibiting highly effective decision making in challenging, ambiguous and rapidly changing situations. SA Carpenter continually tailored an evolving investigative plan in a proactive manner and consistently identified alternatives to address highly complex problems while dealing with a very difficult target set. In particular, SA Carpenter displayed superior ability to simultaneously execute Title III operations and CHS/UCE operations in a well coordinated manner. This resulted in superior results, including frequent incriminating admissions by subjects of not only their historical criminal conduct but future plans and specific intent. At a critical phase of the case, a UC was asked to provide a loan to a third party. SA Carpenter recognized this as an opportunity to expand the case and as critical to preserving the UC's bona fides as a high roller. SA Carpenter effectively and passionately advocated for approval to move forward with this loan, despite initial resistance from SDNY who eventually concurred with the loan. SA Carpenter used this opportunity to secure additional evidence against a subject. This directly resulted in a Title III on the subject's mobile phone and set in motion events which would widely expand the case from addressing bribery by NCAA coaches to incorporating the illegal conduct of officials at a major international Sportswear company.

SA Carpenter has traveled frequently for this matter and has exhibited a superior work ethic in working long hours, including on weekends and nights to move this case forward. SA Carpenter did an excellent job in handling the CHS in this case as well as serving as the handler for the main UCE. The CHS and UCE both performed incredibly well operationally and SA Carpenter deserves a high degree of credit for their success.

SA Carpenter efficiently coordinated the tasks and investigative roles of a large team of Ballerz personnel. He identified the need for additional resources for the investigation and successful integrated 2 UCEs, the support of Stagehand Assets and Branch D personnel to advance the case. SA Carpenter showed strong skills in prioritizing investigative resources, in particular he did an excellent job in managing the time and energy of a CHS who resided out of the AOR and required significant comm|unication and coordination efforts. Under SA Carpenter's guidance, a CHS, who had previously been publically identified by the SEC for misconduct and had been unsuccessful in developing evidence when under the guidance of a prior CHS handler became a highly productive FBI CHS. Without SA Carpenter's guidance the CHS would not have been successful in the initial stages of this case and it is likely there would have been minimal if any investigative results. Similarly SA Carpenter's effort in tasking the main UCE were critical in the UCE quickly establishing bona fides with subjects and accomplishing major investigative objectives quickly. The UCE had the resources and guidance to significantly expand this investigation in the summer of 2017 in large part due to the efforts of SA Carpenter.

SA Carpenter and a SDNY AUSA had a less than optimal professional relationship which required significant engagement from his SSA with SDNY PC Unit Chief to resolve. Additionally, SA Carpenter and the assigned SDNY Investigator also had an unproductive relationship. SA Carpenter also had difficulty in dealing with a component of the Office which was tasked to support the Group I which resulted in an unnecessary distraction from investigative efforts. These ongoing issues were a significant drain of time and energy for the prosecution team resulting in a rating of Minimally Successful for CE 3, Relating with Others and Providing Professional Service. Despite these issues with SDNY, SA Carpenter interacted positively and professionally with others and promoted teamwork and team involvement in planning and decision making within the FBI case team. SA Carpenter served as a role model for the more junior members of the FBI case team and was effective in sharing investigative and operational skills.

SA Carpenter actively sought out feedback on his performance and areas for improvement and took steps to improve his performance and refine his skills. In particular SA Carpenter adjusted his CHS handling techniques to optimize the CHS's effectiveness and integrated his SSA and Co-Case Agent into CHS matters to ensure the most effective CHS results. The review of Title III and CHS/UC recordings was used to advance investigation and develop the handling skills of the case team. While SA Carpenter performed at a high level in acquiring and sharing operational and investigative knowledge, during the course of the Group I, SA Carpenter demonstrated a basic understating of administrative guidelines and policy matters resulting in a Successful rating for the Critical Element of Acquiring, Applying and Sharing Job Knowledge.

SA Carpenter represented the FBI well for the majority of the rating period but exhibited poor judgement and behavior while deployed on a TDY to Las Vegas for an operation resulted in a rating of Minimally successful for Maintaining High Professional Standards. While not a comprehensive description of his conduct , SA Carpenter appeared to have displayed poor judgement in some of his operational security practices and behavior. Further, while not a comprehensive description of his conduct, SA Carpenter did not immediately, or in a timely manner report events constituting potential misuse of funds to his chain of command. The conduct while on this TDY resulted in SA Carpenter's removal from the case team and immediate transfer from C14. As a result there was a major disruption to the investigation. This disruption was however addressed by a highly capable case team who were positioned to succeed during a period of transition. Their success is in no small part credited to SA Carpenter's role in creating a highly effective team and the investigative framework he helped develop during the course of his role as the Lead Case Agent.

SA Carpenter communicates clearly and concisely. SA Carpenter capably documented investigative matters in a well organized and comprehensive way and was sought out by case team members for his review and guidance of written products. SA Carpenter exhibited very strong oral communication skills. He frequently engaged in highly effective dialogue with SDNY, the case team and his SSA to address operational issues and highly technical legal analysis, SA Carpenter was able to serve as a excellent conduit of operational information from a CHS and two UCES to SDNY in order to ensure their concerns were addressed. Similarly he delivered complex legal and operational guidance

from SDNY and FBI management to the CHS/UCEs and field personnel in a way which was easy to understand, often in difficult circumstances and in high pressure operational situations.

SA Carpenter was active in developing and operating a HUMINT base, coordinating with Intel components to address intelligence requirements and produce intelligence products. SA Carpenter exhibited strong CHS handling skills during the course of the investigation and he effectively used variety of data repositories to collect, analyze and produce intelligence.

SA Carpenter put forth effort which exceed the established goals and objectives when he was assigned to Ballerz. He was consistently anticipating and proactively planning for contingences and this resulted in an increased contribution to the mission from him and members of his case team. In less than a year, the Ballerz team was responsible for 19 Title III initiations or renewals, Due to the high operational tempo of this investigation, much of which was conducted outside the AOR, SA Carpenter frequently secured significant results with much less guidance then would be expected. In particular SA Carpenter's successfully achieved results at the outstanding level in relation to his operation of a CHS, his operation of a UC, his ability to execute a complex investigative plan which included parallel tracks of CHS/UCE Operations and multiple Title IIIs. The Ballerz takedown has already had a major national impact and as the prosecution proceeds is likely to continue to have major impact. The success to date of this case would not have been possible without the efforts of SA Carpenter.

| **FD-728a**<br>Revised<br>12-23-2014 | FEDERAL BUREAU OF INVESTIGATION<br>Performance Appraisal System — Special Agent and Professional Staff<br>**Performance Appraisal Report - Cover Page** |
|---|---|

### EMPLOYEE AND RATING INFORMATION

| | |
|---|---|
| 1. Payroll Name of Employee:<br>**Scott F Carpenter** | 2. Employee's Personnel File Number: |
| 3. Position Title, Grade and Position Number:<br>**Special Agent** | 4. Office of Assignment and Cost Code:<br>New York/ |
| 5. Type of Appraisal:<br>**(A)**    Rating of Record    Date: **9/30/2018** | 6. Summary Rating:<br>☐ Unacceptable<br>☐ Minimally Successful<br>☑ Successful<br>☐ Excellent<br>☐ Outstanding |

### SIGNATURES

7. _Signature of Rating Official_    ASAC Stephen Schmaler    Name (Typed or Printed)    10/23/18 Date

8. _Signature of Reviewing Official_    SAC George Ennis    Name (Typed or Printed)    10/23/18 Date

I am aware that a rating of Unacceptable will preclude me from consideration for promotion, transfer, and/or a within-grade increase and may be the basis for my reassignment, reduction in grade, or removal. My signature only indicates that I have reviewed this appraisal, not that I am necessarily in agreement with the information herein or that I am relinquishing my right to request reconsideration of it.

9. _Signature of Employee_    10/23/18 Date

### BPMS / PAU

| 10. Field/FBIHQ Division Use — Entered into BPMS | PAU USE ONLY: |
|---|---|
| By: _____<br>(Initials)<br>On: _____<br>(Date)<br>Date of Plan: _____<br>Plan Renewal Date: _____ | Logged: _____<br>Reviewed: _____<br>Entered: _____<br>Verified: _____ |

| FD-728b Revised 12-23-2014 | FEDERAL BUREAU OF INVESTIGATION<br>Performance Appraisal System — Special Agent and Professional Staff<br>**Performance Appraisal Report - Evaluation Page** |
|---|---|

**EMPLOYEE INFORMATION**

| 1. Payroll Name of Employee:<br>Scott F Carpenter | 2.  Employee's Personnel File Number: |
|---|---|

**EVALUATION**

| Critical Element | | Rating Level | | | | | |
|---|---|---|---|---|---|---|---|
| | | Unacceptable | Minimally Successful (2) | Successful (3) | Excellent (4) | Outstanding (5) | Numeric Value |
| 1. | Investigating, Decision Making, and Analyzing | ☐ | ☐ | ☑ | ☐ | ☐ | 3 |
| 2. | Organizing, Planning, and Coordinating | ☐ | ☐ | ☑ | ☐ | ☐ | 3 |
| 3. | Relating with Others and Providing Professional Service | ☐ | ☐ | ☑ | ☐ | ☐ | 3 |
| 4. | Acquiring, Applying, and Sharing Job Knowledge | ☐ | ☐ | ☑ | ☐ | ☐ | 3 |
| 5. | Maintaining High Professional Standards | ☐ | ☐ | ☑ | ☐ | ☐ | 3 |
| 6. | Communicating Orally and in Writing | ☐ | ☐ | ☑ | ☐ | ☐ | 3 |
| 7. | Achieving Results | ☐ | ☐ | ☑ | ☐ | ☐ | 3 |
| 8. | Intelligence | ☐ | ☐ | ☑ | ☐ | ☐ | 3 |

**Sum of Numeric Values:**     24   [3]

÷

**Number of Critical Elements:**     8   [4]

=     3.00   [5]

| **FD-728c**<br>Revised<br>12-23-2014 | FEDERAL BUREAU OF INVESTIGATION<br>Performance Appraisal System — Special Agent and Professional Staff<br>**Performance Appraisal Report - Overall Summary Rating Narrative Page** |
|---|---|

| **EMPLOYEE INFORMATION** ||
|---|---|
| 1. Payroll Name of Employee:<br>  Scott F Carpenter | 2. Employee's Personnel File Number: |

**OVERALL SUMMARY RATING NARRATIVE**

SA Scott F Carpenter has been on a TDY to the Administrative Division, Branch C, since August 2017.

While assigned to Branch C, SA Carpenter has been assisting the Facilities unit with several ongoing construction projects including the rehabilitation of the entire 26th floor, Annex and FOB, in 26 Federal plaza. SA Carpenter serves in the role of Deputy construction project manager for the rehabilitation project of the 26th floor. In this role he assists with the scheduling of all deliveries of construction materials for the project, assists with escorting all construction workers to their work stations while in FBI space, he ensures that all work performed by each group of construction workers, plumbers, electricians, carpenters etc., is performed in accordance with the specifications in the contract, and he ensures that all worksite health and safety measures are being adhered to. SA Carpenter also serves as the Acting construction project manager when the project manager is on vacation.

SA Carpenter has been very reliable in this role and has ensured that the construction projects goals and timelines have been routinely met. SA Carpenter has been very flexible in this role also and rarely misses and assigned shift which can include evening hours and weekends depending on the different phases of construction. With the appropriate guidance SA Carpenter also ensures that all FBI Security Division protocols and standards for construction projects are followed and adhered to during this project.

During the construction project SA Carpenter provided significant medical assistance to a construction worker that came into contact with a live electrical wire and was seriously injured. During the incident, SA Carpenter wrapped the construction workers bleeding arm in a bandage and escorted him to the FBI Health Services Unit. SA Carpenter ultimately remained with the construction worker until an ambulance arrived. SA Carpenter's swift actions during this medical emergency were critical in ensuring that the injuries suffered by the construction worked were quickly addressed and prevented from becoming worse or life threatening.

ASAC Stephen Schmaler recommends a rating of successful during the review period based solely on his assistance to the Facilities unit during this time.

EXHIBIT C

CARPENTER AND CARPENTER

ATTORNEYS AT LAW

707 BROADWAY

P.O. BOX 772

BAYONNE, NEW JERSEY 07002

(201) 436-1444

FRANK T. CARPENTER III

CHRISTINE A CARPENTER

FAX NO. (201) 436-7940

E-MAIL: carplaw@msn.com

August 10, 2022

Honorable Gloria M. Navarro
United States District Judge
District of Nevada
333 Las Vegas Blvd South
Las Vegas, NV 89101

Re: *United States v. Carpenter, 2:22-cr-00022-GMN-NJK*

Dear Judge Navarro,

I am the father of defendant Scott Carpenter. You can't imagine the pain, to refer to my son that way -- as a defendant.

Let me first say that what my son did was wrong. WRONG. And I am heartbroken, as I know he is too, that his name is tarnished and, more important, that his ability to serve and protect his country came to such a screeching halt.

I have been a lawyer for 48 years and a municipal judge for 32 years. In my almost half a century in those roles, and the tens of thousands of cases I've been involved with, I've never seen a case like this, that has gone on for so long when the mitigating circumstances are so overwhelming. The same country that exposed my son to PTSD is now punishing him for exhibiting a symptom of PTSD.

1

US 172446934v1

When I asked him why he made that choice, he gave a response that left me speechless (and I am never speechless). His response was, "You and Mom need to be protected. Who do you want to protect you?" I had no response but supported his decision, and couldn't argue with his logic.

As a top Military Science graduate, he had first choice of the different areas in the Army. His selections were frightening and breathtaking. Each of his choices was one of the most dangerous military areas: infantry, 82nd Airborne (40 jumps from a perfectly functioning aircraft), Ranger School.

After training, he did two tours in Iraq. On one tour, he was a platoon leader of a "Scout Platoon." Everyone knows that the Infantry is the "tip of the sword." The Scout Platoon's job is to go out in front of the Infantry to draw fire and locate the enemy. He didn't have to put himself in that danger, but he chose to out of love for his country.

Although he never complained, it was clear he was exposed to a lot in Iraq. He earned the Bronze Star Medal, along with various other awards.

When he came back to the States, I had a number of friends on Wall Street, all of whom wanted Scott to work for them. He turned them down. He wanted to be a Special Agent for the FBI.

At this time he lived alone, not with us. For a time, he lived on our sailboat in New York Harbor. He then moved to an apartment in Hoboken, NJ with friends. This is when I first noticed his excessive drinking. Up to his second deployment, he would drink socially, a beer at a barbeque or wine at dinner. However, he had started to become reliant on vodka. Whenever I saw him, he either had a drink or I could smell it on his breath. I still did not connect this to bigger mental health issues or the symptoms of PTSD that I learned about later.

2

During the time he was a rookie FBI Agent, he was assigned to various units. His stellar reputation spread, and many unit supervisors wanted him. He was excellent. If you review his FBI record, you will see this. For example, he was the chief investigator in the worldwide and very successful FIFA (professional soccer) investigation.

Subsequently, he was assigned to the NCAA investigation as the lead investigator, resulting in ten convictions. The last part of this investigation required an undercover operation in Las Vegas. When asked to go to Las Vegas to conduct the undercover operation, he initially declined because a good friend of mine, Dr. Anthony Caputo, had died. He was the closest thing to an uncle Scott had. But the FBI twisted his arm, and he agreed to go despite the fact that he would miss Tony's funeral.

After the last meeting, all the Agents celebrated and drank. I now know that Scott himself drank a whole bottle of vodka, and then he used some of the undercover money to play blackjack, losing $13,500.

When he came back to New Jersey, he asked me for $15,000 in cash from his money, which was being managed by his mother. He didn't explain what it was for. We were in the dark, but still relatively unconcerned.

At the recommendation of the FBI, we then hired an attorney who represented many FBI Agents, Larry Berger of Long Island. We gave attorney Berger a $15,000 check made payable to his Trust Account, advising him to notify the FBI or the Federal Government that he had the money in his Trust Account. Although he endorsed the check with his signature, he never deposited the check in his Trust Account, nor did he notify anyone in the Federal Government that he had the money. I kept calling him to inquire why he hadn't deposited the check or notified anyone in the Government, and he kept telling me he would do it. I finally told him he

3

was fired and to return the check, which he did, a year later. A copy of the check is attached, dated August 15, 2017. His return envelope with the check, but no letter, dated July 11, 2018 is attached also.

The prosecution has taken over 5 years. That mystifies me; it is a case where the defendant voluntarily admitted his misdeed to all his supervisors on day one.

The FBI kept him at his job after he had admitted his guilt, for almost five years. The FBI changed his job by assigning him to secure an FBI construction site for three years. He showed up every day to guard lumber and bricks. A straight-A student in high school, a Dean's list student in college, an Army Captain who did two tours in Iraq, won the Bronze Star Medal and developed symptoms of PTSD did this job for three and a half years without complaint. Incidentally, while on the job at the construction site, he singlehandedly put out a fire and saved an electrician's life.

For his last year and a half, he was assigned to one of the most secretive units in the FBI: foreign counterintelligence. He didn't seek the position; the position sought him.

During the last five years, he and his wife of seven years, Beth, discussed having children. Although they both want children, they decided to wait until this nightmare ended, thinking it might take a few months, not five years. Now they are confronted with the likelihood of growing old without children.

Why did all this happen? It happened because Scott so badly wanted to serve his country. And when he developed symptoms of PTSD and a drinking problem as a result, he did something wrong and stupid.

I am sad and disappointed by what my son did, but at the same time I couldn't be prouder of how he has behaved in the aftermath. As a judge myself (albeit a municipal judge) and as a

4

father, I urge you to look at Scott with compassion and empathy.  In my view, he has been punished and has suffered enough.

Sincerely,

Frank T. Carpenter III

US 172446934v1

UNITED STATES

22 JUN 2038 PM 1

Carpenter and Carpenter
707 Broadway PO Box 772
Bayonne, New Jersey 07002
Attn: Frank Carpenter, III

07002-077272

Lawrence A. Berger, Esq.
70 Glen Street, Suite 249
Glen Cove, New York 11542

# EXHIBIT D



**WAYFARE**
COUNSELING, LLC
PO Box 273 Mount Freedom, NJ 07970
Phone:  973-617-0042      Fax:  973-850-0711

TO:      Paul Fishman
         One Gateway Center
         Suite 1025
         Newark, NJ 07102

FROM:    Michael T. Cocuzza, MS, LPC, LCADC
         PO Box 273
         Mount Freedom, NJ 07970

RE:      Scott Carpenter (DOB: 05/08/1981)

August 10, 2022

Dear Mr. Fishman,

My name is Michael T. Cocuzza, a licensed professional counselor (LPC) and licensed clinical alcohol and drug counselor (LCADC) for the state of New Jersey.  I am certified by the National Board of Certified Counselors with an additional, advanced certification as a clinical mental health counselor (CCMHC).  I have had an extensive experience in diagnosing and treating clients with mental health disorders, such as depression, anxiety, post-traumatic stress, and attention deficit hyperactivity disorders along with co-occurring substance use disorders.

This letter is to verify the treatment of the above-named client, Scott Carpenter, with WayFare Counseling, LLC, from December 30th of 2017 ending on April 5th of 2021.  The client attended bi-weekly, one-hour sessions of psychotherapy and he eventually stepped down to monthly appointments at the end of 2018 as his symptoms improved.

Before attending therapy at my private practice, Scott was a client on my caseload at Seabrook Outpatient in Morristown, New Jersey, following a successful completion of residential treatment for alcohol dependency.  While under my supervision, Scott successfully completed both intensive outpatient and outpatient levels of care, remaining fully compliant with addiction recovery protocols, and abstaining from alcohol use.

Of his own accord, Scott decided to continue his own therapy goals at my private practice specifically to address ongoing symptoms of anxiety.  Through the course of this ongoing care, Scott addressed symptoms of post-traumatic stress disorder that originated from his time in active duty in the military.  As time went on, treatment addressed the perpetual stress that Scott was placed onto him and his family because no formal charges were placed onto him until years after being investigated.  The extremely slow process to make a decision in Scott's case negatively impacted his capacity to make decisions for his future such as career development,

financial goals, and questions impacting him and his wife's decision to raise a family. These circumstances are particularly unfortunate as Scott reiterated his remorse and his desire to make things right at the outset.

It should be noted that, despite adversity, throughout therapy, Scott has demonstrated compliance and maintained ongoing efforts to improve and maintain his mental health.

Sincerely,

Michael T. Cocuzza
Licensed Professional Counselor
Licensed Clinical Alcohol and Drug Counselor
Approved Clinical Supervisor
Certified Clinical Supervisor
Certified Clinical Mental Health Counselor
National Certified Counselor
Certified Human/Animal Intervention Specialist

# EXHIBIT E

Colonel (Retired) Michael G. Pratt

████████████████

August 7th, 2022

Honorable Gloria M. Navarro
United States District Judge
District of Nevada
333 Las Vegas Blvd South
Las Vegas, NV 89101

Re: *United States v. Carpenter*, 2:22-cr-00022-GMN-NJK

Dear Judge Navarro,

The purpose of my letter is to provide a character reference for Scott Carpenter whom I have known for over 15 years after serving with him in combat for 15 months. I was very surprised to hear that he is pending legal action, and I sincerely hope there is a positive resolution to his matter after careful consideration. It would be a shame for him to receive any permanent set-back to his life.

After graduating from the United States Military Academy at West Point, I served in the active duty U.S. Army for over 27 years as an Infantry officer and retired as a Colonel in 2020 after commanding units as large as 800 Soldiers strong. I had the absolute honor of serving with then Captain Scott Carpenter for two years both at Fort Bragg, NC, and in Baghdad when I was his direct supervisor in the elite 1st Battalion, 504th Parachute Infantry Regiment in the 82nd Airborne Division. I personally observed his performance during these two years on a daily basis, since he was my "right hand." Additionally, I have kept in regular contact with him since we last served together in 2008.

To put my respect for him in context, it is important to explain the circumstances under which we formed our life-long bond. When the President ordered the offensive Surge of troops into Baghdad in 2006, our battalion was serving as the global response force ready to deploy anywhere in the world within 18 hours and were the first to respond. Once in Baghdad, I chose Scott as my assistant despite the fact that he was junior to other candidates due to his maturity, diligence, and effectiveness. He excelled in this duty at a level commensurate to those much senior to him. Scott's ability to turn chaos into order is unmatched by his peers, and he has a calming effect on all of those surrounding him while successfully managing several challenging tasks simultaneously. Ultimately, he was awarded the Bronze Star Medal for his planning and resourcing of over 30 battalion-sized combat operations in the most contentious area of operation in Baghdad.

He consistently set the ethical standard for those under his charge, and he passionately fought for their well-being. Scott is dedicated and loyal to the organization, and mission accomplishment is his priority. He is proactive and constantly seeks self-improvement. I absolutely trusted his judgment with the most important of tasks, and I knew that his expert problem-solving abilities would consistently produce an outstanding product. He not only drastically impacted our unit in this important staff position, but he also had a tremendous positive effect on our teamwork within the battalion. Scott earned a reputation for working respectfully and cooperatively with his subordinates, peers, and supervisors, providing candid and constructive input to our missions. Most importantly, Scott shared his knowledge and

experience freely, and was more concerned with bettering others than taking sole credit for a creative idea. His peers and subordinates frequently sought out his guidance and mentorship knowing that he is readily available to assist others.

Scott was not only the best staff officer in our organization, but I also compared the performance of others to him throughout my career as a commander. He clearly stood out from his peers and it was evident that he would quickly climb the officer ranks and command with distinction. His work ethic is beyond reproach and his word is absolutely binding. Due to the high moral principles that he displays at all times, people quickly follow his lead. His keen sense of humor and his commonsense approach furthers his leadership appeal. When Scott decided to honorably transition to a civilian career where he could continue his service to the country, it was truly a loss to the Army despite my best attempts to change his mind. I would fight to serve with him again in the future.

I cannot overstate the value of Scott's phenomenal performance and character while serving in the U.S. Army, and I truly hope that this current set-back will not have a permanent effect on his potential in the future. He has dedicated his life to the selfless service of our Nation, and I have total confidence that he has internalized the hard lessons resulting from this situation

Sincerely,
Michael G. Pratt
Colonel (Retired), Infantry
U.S. Army

# EXHIBIT F

John F. Penza

August 8, 2022

Honorable Gloria M. Navarro
United States District Judge
District of Nevada
333 Las Vegas Boulevard South
Las Vegas, NY 89101

Re:     *United States v. Carpenter*, 2:22-cr-00022-GMN-NJK

Dear Judge Navarro,

My name is John Penza and I have been a co-worker and friend of Scott Carpenter for over 10 years.  As an FBI Agent, I had the opportunity to work with Scott on a number of investigations and was also his Supervisor.  While working and supervising Scott, I witnessed an individual who was articulate, honest, intelligent, patriotic, passionate and able to adapt to stressful situations, all characteristics of an effective FBI Agent.  Additionally, I have been in Scott's company on numerous social occasions and have always witnessed his behavior to be professional and controlled.  I have since retired from the FBI and as mentioned above, consider Scott a friend.

As a former member of law enforcement for over 27 years, I understand the gravity of the situation Scott is currently in.  I know he has paid a tremendous personal and professional cost for his behavior which he now stands before you for sentencing.  I would not be honest with myself, Scott or you if I did not relay my disappointment with Scott for his behavior; he was an FBI Agent and our integrity is everything.  However, witnessing Scott deal with this situation for over 5 years, attending an inpatient and outpatient facility for alcohol abuse, being dismissed from the FBI and pleading guilty in your Court, has displayed to me Scott's understanding and acceptance of his behavior.

I truly believe Scott is a good person who made a one-time unfortunate and serious mistake and as stated above, he has paid a tremendous personal and professional price.  Thank you for taking the time to read my letter.

Sincerely,

John F. Penza

# EXHIBIT G

## Letter from Beth Carpenter
## Filed Under Seal